**ORAL ARGUMENT NOT YET SCHEDULED**
**CASE NO. 12-5407**

---

**UNITED STATES COURT OF APPEALS**
**DISTRICT OF COLUMBIA CIRCUIT**

---

**AMANATULLAH, DETAINEE, and ABDUL RAZAQ,**
**AS NEXT FRIEND TO AMANATULLAH,**

**Appellants,**

**v.**

**BARACK OBAMA,**
**PRESIDENT OF THE UNITED STATES, et al.,**

**Appellees.**

---

Appeal from the United States District Court
For the District of Columbia, C.A. No. 1:10CV00536 (RCL)
The Honorable Royce C. Lamberth, District Judge

---

**BRIEF OF APPELLANTS**

---

**Tina M. Foster**              **Eric L. Lewis  (#39627)**
**Golnaz Fakhimi**              **A. Katherine Toomey  (#46678)**
**INTERNATIONAL JUSTICE**       **LEWIS BAACH PLLC**
  **NETWORK**                   **1899 Pennsylvania Avenue, NW**
**P.O. Box 610119**             **Washington, DC  20006**
**New York, NY 11361**          **Telephone:  202-833-8900**
**Telephone: 718-717-8467**     **Facsimile:   202-466-5738**
                                Eric.lewis@lewisbaach.com


**Dated:  April 26, 2013**       **ATTORNEYS FOR APPELLANTS**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), appellant Amanatullah, through his Next Friend Abdul Razaq, certifies the following:

**A.     PARTIES AND AMICI**

    **1.     Petitioners:**

        Amanatullah

        Abdul Razaq, Amanatullah's brother and Next Friend

    **2.     Respondents:**

        President Barack Obama

        Secretary of Defense Robert M. Gates (now Charles Hagel)

        John and/or Jane Does Nos. 1 – 5

    **3.     Intervenors:**

        None

    **4.     Amici:**

        None

**B.     RULINGS UNDER REVIEW**

The ruling under review was entered on November 15, 2012 by the U.S. District Court for the District of Columbia (Lamberth, J.), and consisted of an order and memorandum opinion granting respondents' motion to dismiss for lack of jurisdiction. The memorandum opinion is included in the Joint Appendix at JA1258. The official citation for the memorandum opinion is No. 10-536, 2012 WL 5563955 (D.D.C. Nov. 15, 2012).

### C.    RELATED CASES

This case has not previously been on review before this or any other court apart from the district court.  Petitioners are aware of two cases now pending in this Court that both involve appeals of district court orders dismissing petitions for review filed by detainees at Bagram Air Force Base in Afghanistan: *Hamidullah v. Obama*, Appeal No. 12-5410 and *Amin al Bakri v. Obama*, Appeal No. 12-5399 (consolidated with 12-5401 and 12-5404).  The district court's opinion in this matter relies in part on its opinion in *al Bakri*.  The *al Bakri* case was previously on review before this Court in Appeal Nos. 09-5265, 09-5266, and 09-5267.  *See Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010).

On February 21, 2013, this Court issued an order directing the Clerk to calendar this case for oral argument on the same day and before the same panel as *Hamidullah* and *Al Bakri*.   On March 12, 2013, on the parties' joint motion, this Court issued an order establishing a joint briefing schedule for the three related cases. In accordance with that order, appellants in the three cases are filing separate briefs but a single Joint Appendix.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY .................................................................................. vii

STATEMENT OF JURISDICTION..................................................1

STATEMENT OF THE ISSUES.....................................................1

STATEMENT OF THE CASE.........................................................3

STATEMENT OF FACTS ..............................................................5

SUMMARY OF THE ARGUMENT ...............................................10

ARGUMENT ................................................................................12

    I.    Standard of Review ........................................................12

    II.   The District Court Applied the Wrong Evidentiary Standard
       in Assessing Its Jurisdiction ...............................................12

    III.  The District Court Improperly Denied Petitioner's Request for
       Limited, Non-Classified Jurisdictional Discovery..............................17

    IV.  The District Court Erred in Its Analysis of the "Status" Factor
       Under *Boumediene* ...............................................................19

        A.    Amanatullah's Citizenship.......................................21

        B.    Amanatullah's Detainee Status ..............................21

            1.    Amanatullah's Capture in Iraq Likely Shows He Is
               Entitled to Immediate Release.......................22

2.    The Government's Determination Clearing Amanatullah for Release Must Be Weighed as Part of His "Status" Under *Boumediene* ................................. 24

C.    Adequacy of Process ................................................................. 30

V.    The District Court Also Erred in Its Analysis of the "Practical Obstacles" Factor Under *Boumediene* ................................. 31

CONCLUSION ........................................................................................ 37

CERTIFICATE OF COMPLIANCE ....................................................... 38

# TABLE OF AUTHORITIES

## CASES

*Al-Bihani v. Obama*,
  590 F.3d 866 (D.C. Cir. 2010) .................................................................29

*Al Maqaleh v. Gates,*
  605 F.3d 84 (D.C. Cir. 2010) ................................................10, 12, 16, 21

*Al Maqaleh v. Gates*,
  Nos. 06-1669, 08-1307, 08-2143, 2012 WL 5077483
  (D.D.C. Oct. 19, 2012) .....................................................................14, 34

*Almerfedi v. Obama*,
  654 F.3d 1 (D.C. Cir. 2011)...................................................25, 26, 28, 29

*Awad v. Obama*,
  608 F.3d 1 (D.C. Cir. 2010)...................................................25, 26, 28, 29

*Bernard v. U.S. Dep't of Def.,*
  362 F. Supp. 2d 272 (D.D.C. 2005) ........................................................12

*Boumediene v. Bush*,
  553 U.S. 723 (2008) .................................................................................
  ....... 1, 2, 5, 9, 10, 14, 16, 19, 20, 22, 23, 24, 25, 26, 27, 29, 30, 31, 32, 36

*Grupo Dataflux v. Atlas Global Grp., L.P.*,
  541 U.S. 567 (2004) ................................................................................27

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ................................................................................24

*Herbert v. Nat'l Acad. of Scis.*,
  974 F.2d 192 (D.C. Cir. 1992) ..........................................................13, 19

*Ignatiev. v. United States*,
  238 F.3d 464 (D.C. Cir. 2001) ..........................................................13, 14

* Authorities upon which we chiefly rely are marked with asterisks.

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*,
    402 F.3d 1249 (D.C. Cir. 2005) .......................................................12, 13

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950) ...............................................................................27

*Loughlin v. United States*,
    393 F.3d 155 (D.C. Cir. 2004) ................................................................12

*Moser v. Pollin*,
    294 F.3d 335 (2d Cir. 2002) ...................................................................12

*Padilla v. Hanft*,
    547 U.S. 1062 (2006) .............................................................................27

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d Cir. 2009) .....................................................................13

*Sizova v. Nat'l Inst. of Standards & Tech.*,
    282 F.3d 1320 (10th Cir. 2002) ..............................................................19

*Stoyanov v. Winter*,
    643 F. Supp. 2d 4 (D.D.C. 2009) ...........................................................12

## STATUTES & RULES

Authorization for Use of Military Force, S.J. Res. 23, 107th Cong.,
    115 Stat. 224 (2001) ................................................................................7

28 U.S.C. § 1291....................................................................................1

28 U.S.C. § 1331....................................................................................1

28 U.S.C. §§ 2241-42 ............................................................................1

Fed. R. Civ. P. 8(a)(1) .........................................................................12

Fed. R. Civ. P. 12(b)(1) .....................................................1, 5, 12, 13, 18, 19

U.S. Const. art. I, § 9 ............................................................................1

# **GLOSSARY**

| | |
|---|---|
| ARB | Administrative Review Board |
| AUMF | Authorization for Use of Military Force, S.J. Res. 23, 107th Cong., 115 Stat. 224 (2001) |
| CJIATF 435 | Combined Joint Interagency Task Force 435 |
| CSRT | Combatant Status Review Tribunal |
| DoD | Department of Defense |
| DRB | Detainee Review Board |
| JA | Joint Appendix |

## STATEMENT OF JURISDICTION

The jurisdiction of the district court to entertain petitioner's first amended petition for writ of habeas corpus is contested in this case.  Petitioner asserts that the district court had subject matter jurisdiction over his petition, brought through his Next Friend, pursuant to 28 U.S.C. §§ 2241-42 and the Suspension Clause, U.S. Const. art. I, § 9, as interpreted by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008).  Petitioner also invoked federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The district court dismissed petitioner's amended petition in a final order dated November 15, 2012.  Petitioner filed a timely notice of appeal on December 17, 2012.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court applied the wrong evidentiary standard for assessing its jurisdiction on a Rule 12(b)(1) motion to dismiss when it failed to accept as true petitioner's well-pleaded allegations, disregarded his submission of supplemental evidence in support of those allegations, and uncritically accepted the government's evidence, ruling that petitioner could not prevail unless the evidence was essentially "one-sided" in his favor.

2. Whether the district court improperly denied petitioner leave to take limited, unclassified discovery on facts pertaining to subject matter jurisdiction notwithstanding that the government intentionally refused to disclose

information critical to the jurisdictional issues and precluded petitioner from having any contact with his counsel to supply them with information in support of his petition and the court's jurisdictional analysis.

3.   Whether the district court improperly applied or refused to consider the factors listed by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008), as among those pertinent to subject matter jurisdiction to hear a petition for habeas corpus of a person detained by the U.S. government beyond this country's borders when it:

a.     Failed to consider petitioner's citizenship;

b.     Disregarded the inadequacy of the government's disclosures about its determinations of his status;

c.     Ignored his uncontested allegations that, although he was first taken into custody during the military conflict in Iraq, he has not been released and repatriated upon cessation of Iraq hostilities in December 2011;

d.     Declined to consider the uncontested fact that his current status is that of a detainee whom the government has cleared for release, erroneously ruling that such clearance is irrelevant to the *Boumediene* analysis; and

e.  Improperly based its finding that practical obstacles precluded habeas review solely on the fact that petitioner is being held at Bagram Air Base in Afghanistan without considering whether its location actually imposed any such obstacles and ignoring petitioner's uncontested evidence that it did not.

## STATEMENT OF THE CASE

Genuine access to facts is elusive in the habeas setting when the petitioner is imprisoned virtually incommunicado outside the United States.  Whatever the government may know, it reveals only what it chooses.  Whatever is known to the petitioner is unavailable when the government bars the door between the petitioner and his counsel and even the petitioner and his family.  Under these circumstances, the petitioner's only recourse is to the court.  And the court, exercising the classic function of the Great Writ within our crucial scheme of Separation of Powers, is obliged to order the government either to justify the petitioner's continued detention or to order his release.

Yet in the court below this responsibility was abdicated.  The court neither ordered the government to release its stranglehold on the facts nor did it properly credit petitioner's uncontested allegations concerning his status or the justifications for his release.  Instead, the district court discounted petitioner's allegations and

refused to order unclassified discovery into jurisdictional facts to the extent they were disputed by the government. This Court should correct these injustices.

Certain facts are known and undisputed. Petitioner Amanatullah, son of Mohammed Iqbal, is a Pakistani citizen who was taken into custody in 2004 by British forces in Iraq, handed over to U.S. forces in that country, and then rendered from Iraq to U.S. military custody at Bagram Air Base in Afghanistan, where he has been held ever since. For the last nine years, despite repeated requests, he has never been allowed to meet or speak with legal counsel, and has, in the last few years, been allowed only infrequent, censored contact with his family. What little is known of him comes largely from his brother, Abdul Razaq. The basis, if any, for the government's conclusory statements that Amanatullah has "met the criteria for internment" and "is lawfully detained" (JA1230, ¶ 15), is unknown. The government only asserts baldly that this has been the conclusion of its Detainee Review Boards ("DRB").

Amanatullah's habeas petition alleges, however, that he has never been involved in *any* hostilities against the United States: neither the traditional wars that the U.S. has been fighting in Iraq or Afghanistan or the more novel U.S.-led "Global War on Terror." He flatly denies any affiliation with or support of al Qaeda or the Taliban. The circumstances of his presence in Iraq, where he was taken into custody, have never been disclosed, but there is no assertion by the

4

government, much less probative evidence, that he was in any way involved in hostilities in that or any other country, and Amanatullah avers that he was not. Critically, Amanatullah also alleges that nearly two years ago, U.S. authorities at Bagram informed him that he had been cleared for release. Yet he remains incarcerated at Bagram still.

The district court dismissed Amanatullah's habeas petition not on its merits, but on grounds that it failed to state a basis for federal jurisdiction under Rule 12(b)(1) under the standards the Supreme Court announced in *Boumediene*. Yet contrary to established precedent, the district court gave little, if any, credence to Amanatullah's uncontested allegations, uncritically accepted the government's contrary conclusory assertions, and conducted no evidentiary hearing on a Rule 12(b)(1) threshold basis into disputed jurisdictional facts relevant under the *Boumediene* framework. This wholly improper approach rendered the Great Writ nugatory and abdicated the court's vital role under the Separation of Powers required by the Constitution. The Supreme Court's *Boumediene* decision neither compels, nor supports, such an outcome. It should be reversed.

## STATEMENT OF FACTS

Petitioner Amanatullah, who is 45 years old and married with five young children, lived with his family in a peaceful village near Faisalabad, Pakistan. (JA1184, ¶ 11). Prior to his detention, he worked as a rice merchant in his native

country and had begun exporting rice to Iran, a major rice importer.  (JA1185, ¶ 13).  In February 2004, he traveled to Iran for this purpose.  At the conclusion of his business in Iran, he crossed the border into Iraq on a pilgrimage to holy Shia sites located there, whereupon British forces took him into custody in circumstances yet to be revealed.[1]  (JA1185, ¶ 14). The British later transferred him to U.S. forces in Iraq.  (JA1181, ¶ 1).  Despite the fact that his detention had no ostensible connection to the war in Afghanistan, the United States transported him to its internment facilities at Bagram.  (JA1181, ¶ 1).  He has remained there ever since, now nine long years and counting, held virtually incommunicado and without access to any meaningful process by which to challenge his detention. (JA1181, ¶ 1; JA1185-86, ¶¶ 14-20).

He filed the instant petition with the help of his brother in Pakistan, with whom he has been allowed only infrequent contact, all of it monitored and censored by his jailors.  (JA1182, ¶¶ 3, 16-17).  Despite Amanatullah's repeated requests to be allowed contact with his counsel, the government has denied him access to any lawyers who could assist him in supporting his petition in the district court.  (JA1185, ¶¶ 18-19).  Beyond providing a declaration by Vice Admiral

---

[1] In the British habeas case of Yunus Rahmatullah, a Pakistani citizen who was captured with Amanatullah by British forces in Iraq and held by U.S. forces at Bagram, the English Court of Appeal not only found jurisdiction, but also issued the writ.  (JA1239-56).  There is no reason why this Court should come to a different conclusion.

Robert S. Harward, the commanding officer in charge of his custody, stating the conclusion that Amanatullah was determined to have "met the criteria for internment" under the Authorization for Use of Military Force, S.J. Res. 23, 107th Cong., 115 Stat. 224 (2001) ("AUMF") at his latest DRB proceeding in December 2010, the government has provided no information as to exactly what criteria he is said to have met, let alone *any* particular evidence purportedly supporting its "determination." (JA1230, ¶ 15). In lieu of facts, the government has merely offered its unilateral, unsupported and untested conclusion that Amanatullah is "lawfully detained." (JA1223, ¶ 15). Fairly read, the affidavits submitted by the government on this point go no further than the statement, "Just trust us, he's guilty of something."

By contrast, Amanatullah specifically alleges that he was informed in writing by U.S. authorities at Bagram that he has been approved for release.[2] (JA1203, ¶ 92). Rather than denying this, the government simply asserts that it is "irrelevant" and that Amanatullah is "wrong" to suggest that this Court should consider his status as "cleared for release" in determining its own habeas jurisdiction. *See* ECF No. 10, Resp'ts' Mot. To Dismiss First Am. Pet for Writ of

---

[2] This statement is consistent with the procedure described in the court below in Vice Admiral Robert S. Harward's declaration that detainees are clearly advised of their status by the U.S. government. (JA502, submitted in *Amanatullah* in ECF No. 10-3) ("The detainee will be notified, in writing and verbally in a language he or she clearly understands, within 14 days of the approval authority's decision concerning his status classification.").

Habeas Corpus at 25. Has the government finally realized that Amanatullah is actually innocent of any wrongful conduct against the United States or its allies? If so, it has done nothing about it. Coupled with the fact that it has been widely reported by international relief organizations and respected media sources that a large percentage of non-Afghan Bagram detainees are, in fact, innocent and that many of these, like Amanatullah, remain in custody despite having been cleared for release, the allegations in his habeas petition strongly support the compelling inference that Amanatullah's true status is that of a wrongfully detained innocent.[3] Yet the U.S. government appears intent on using the opacity of its processes and restrictions on fact gathering to cover up this miscarriage of justice.

The record further supports, overwhelmingly, that there are no genuine "practical obstacles" that would prevent the district court from conducting the factual inquiry necessary to determining whether habeas relief should be granted to Amanatullah. Evidence submitted in the instant action and in connection with the companion petitions also on appeal to this Court underscores that Bagram's location in an active war theater does not make habeas review for Amanatullah or

---

[3] The probability of mistaken identity is high in this case. Despite the fact that petitioner's name is Amanatullah, son of Mohammad Iqbal, and he has been assigned Internment Serial Number 1432, Department of Defense ("DoD") records appear to record him as "Ahmad Dilshad." (JA1186, ¶¶ 23-24). The government states only that "DoD records reflect that a citizen of Pakistan whose name is the same as or reasonably similar to Petitioner's is being detained at the DFIP." (JA1230, ¶ 14).

the very few rendered third-country nationals like him at Bagram "impracticable or anomalous." *See Boumediene*, 553 U.S. at 759.

First, as recent events make clear, there is no possibility of any proceedings here impairing the sovereignty of Afghanistan or interfering with proceedings in the Afghan courts because the Afghan government has disclaimed any interest in third-country nationals like petitioner. Second and crucially, the judicial proceedings to determine his petition will *not* take place in an Afghan war theater but in a courtroom in the District of Columbia. There is no reason to conclude that participation in this proceeding will place any undue burden on U.S. military operations in Afghanistan. It is uncontested on this record that U.S. military personnel at Bagram are regularly participating in full-blown civilian trials of Afghan detainees at Bagram, including providing forensic evidence and reports on the testimony of witnesses that serve as the foundation for these prosecutions. (JA330-33). There is no basis in the record on which to conclude that they cannot as readily provide similar assistance to the U.S. government here in this case – or even in the tiny number of cases involving other non-Afghan prisoners held at Bagram – without impairing the war effort. The only conceivable difference for the numerous personnel already undertaking these tasks for the Afghan system on a voluntary basis is whether a video link is needed.

These facts and others[4] fully supported jurisdiction in the district court to hear and consider Amanatullah's habeas petition, and the court erred in refusing to exercise it.

## SUMMARY OF THE ARGUMENT

In *Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010) ("*Al Maqaleh II*"), this Court applied the Supreme Court's *Boumediene* decision to determine the jurisdictional basis for the habeas petitions of three detainees who are incarcerated at the Bagram Air Force base in Afghanistan. The instant case addresses the same threshold jurisdictional issue with respect to the petition of another Bagram detainee, but based on his particular circumstances and a different evidentiary record.  The district court dismissed his petition as a cookie-cutter replica of the earlier *Al Maqaleh* appeal.  It did so by improperly:

(i)     disregarding critically important differences in this petitioner's evidentiary record;

(ii)    acquiescing in the government's refusal to provide essential evidence within the government's exclusive knowledge pertinent to application of the *Boumediene* factors here;

---

[4] As directed by the Court in order to avoid duplicating submissions by petitioners in the companion appeal in *Al Maqaleh v. Gates* (Case No. 12-5399), Amanatullah has limited his submission to the facts and arguments that are specific or especially pertinent to his own circumstances, and he adopts by this reference other facts and arguments set forth in the *Al Maqaleh* brief.

(iii)   denying petitioner's request for reasonable and limited discovery of readily available, non-classified information within the government's exclusive knowledge that would have addressed disputed jurisdictional facts in the evidentiary record; and

(iv)   ignoring petitioner's well-pleaded allegations and supporting evidence and instead drawing inferences in the government's favor to which it was not entitled.

A proper assessment by the district court of its jurisdiction to hear petitioner's plea for habeas relief would have confirmed his entitlement to be heard.  Even as it stood, the record showed that this petitioner is a detainee whom the government has actually cleared for release, but it nonetheless persists in holding him.  And petitioner could have further developed this record, had he been permitted to show precisely why he has this "cleared for release" status.  Similarly, the record showed that petitioner's location at Bagram poses no genuine obstacles to the district court's consideration of his habeas petition, notwithstanding its location in a theater of war, as the government's routine participation in countless full-blown trials for Afghan nationals at Bagram so eloquently attests.  Moreover, the recent declaration by the Afghan government that it will not take custody of or try third-party nationals eliminates any possibility of conflict with another sovereign authority.  Here, again, permission to take limited discovery on this issue

11

would have further confirmed that Bagram's location is not an impediment to the district court's exercise of habeas jurisdiction.

In short, this petition is not on the same footing as the ones this Court earlier reviewed in *Al Maqaleh II* – and, indeed, neither are the current petitions by those detainees – and the Court should reverse the improvident dismissal below.

## ARGUMENT

### I.    Standard of Review.

This Court reviews a dismissal pursuant to Fed. R. Civ. P. 12(b)(1) *de novo*. *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1250 (D.C. Cir. 2005); *Loughlin v. United States*, 393 F.3d 155, 162 (D.C. Cir. 2004).

### II.    The District Court Applied the Wrong Evidentiary Standard in Assessing Its Jurisdiction.

A habeas petition, like any other pleading that states a claim for relief, must contain "a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1).  The plaintiff bears the burden of establishing that the court has subject matter jurisdiction, but that burden need only be discharged by a "preponderance of the evidence."  *Stoyanov v. Winter*, 643 F. Supp. 2d 4, 9 (D.D.C. 2009); *Bernard v. U.S. Dep't of Def.*, 362 F. Supp. 2d 272, 277 (D.D.C. 2005); *Moser v. Pollin*, 294 F.3d 335, 339 (2d Cir. 2002).  The court may decide its jurisdiction based on the allegations of the complaint alone or, where necessary,

by also considering the parties' evidentiary submissions on issues pertinent to jurisdiction. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). Unless refuted by such evidence, the court must accept all allegations as true and draw all reasonable inferences in the plaintiff's favor. *Jerome Stevens Pharm., Inc.*, 402 F.3d at 1253; *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009).

In resolving factual issues raised outside of the complaint, the court also "must bear in mind what procedural protections could be required to assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties." *Herbert*, 974 F.2d at 198. The necessary procedural protections include "[i]n many instances . . . evidentiary hearings [to] resolv[e] particularly complicated factual disputes rather than to rely on affidavits alone." *Id.* In some circumstances, ruling on a Rule 12(b)(1) motion "may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction." *Id.* As the Court held in *Ignatiev v. United States*: "We have previously required that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion." 238 F.3d 464, 467 (D.C. Cir. 2001) (citing *El-Fadl v. Cent. Bank of Jordan,* 75 F.3d 668, 676 (D.C. Cir. 1996); *Crane v. Carr,* 814 F.2d 758, 764 (D.C. Cir. 1987)).

13

This is especially so where the evidence pertaining to the issue is within the government's exclusive control. *Id.*

In short, the district court here was required to (i) accept all of the factual allegations of Amanatullah's petition as true; (ii) draw all reasonable inferences in his favor; and (iii) ensure that procedural protections were in place when considering additional evidence submitted by the parties so as to ensure "a full airing of the facts." The court below did none of these things. It repeatedly failed to accept Amanatullah's allegations as true or draw inferences in his favor. Instead, it credited the government's evidence even when that evidence failed to refute the allegations of the petition. Further, the court provided Amanatullah no procedural protections. It did not schedule an evidentiary hearing or allow Amanatullah to conduct jurisdictional discovery, even though many of the facts relevant to the *Boumediene* analysis are exclusively within the government's control or are otherwise unavailable to petitioner without the aid of discovery. The court did not even conduct a proper analysis of the paper evidence submitted by the parties, instead fully crediting the government's evidence while dismissing Amanatullah's out of hand. Moreover, in various instances, the district court based its conclusions on the analysis of similar evidence in *Al Maqaleh v. Gates*, Nos. 06-1669, 08-1307, 08-2143, 2012 WL 5077483 (D.D.C. Oct. 19, 2012) ("*Al*

*Maqaleh III*"), all but ignoring the unique procedural posture and factual circumstances of Amanatullah's petition.

Instances abound in which the district court improperly applied the standard for determining its jurisdiction. One example stands out: Amanatullah's allegation that the government transferred him to Bagram for the very purpose of seeking to deny him the habeas review to which he would have been entitled had he been transferred instead to Guantánamo Bay where the writ now runs. Amanatullah's petition contains extensive and fact-specific allegations that the government first used Guantánamo as an enclave where it believed habeas review could be evaded, and, when the Supreme Court disabused the government of that view, it switched to Bagram as its preferred judicial-free detention center. (JA1191-94, ¶¶ 53-63). When the government contested jurisdiction, Amanatullah submitted additional documentary evidence showing the government's purposeful evasion of judicial review. (JA900-09, submitted in *Amanatullah* in ECF No. 23).

Tellingly, the government did not counter with any contrary evidence. The district court was thus required to accept these allegations as true, but it refused to do so. Instead, in its cursory review of petitioner's evidence, the district court adopted a remarkable new standard: whether the evidence was completely "one-sided." (JA1275) ("the facts are 'not as one-sided as petitioners represent'"). The district court's own statement reflects that the evidence favored petitioner's

position.   Yet in the face of this evidence and petitioner's allegations, the government *never denied* that Amanatullah was rendered from Iraq to Bagram for the purpose of evading judicial review, and any additional information on this point is exclusively within the government's control or otherwise unavailable to petitioner.   In these circumstances, it was error for the court not to credit petitioner's unrefuted allegations or to resolve this disputed question of fact without affording petitioner procedural protections, such as an evidentiary hearing or discovery.[5]

Other examples include (i) its failure to properly weigh Amanatullah's status and the adequacy of process used to determine that status; (ii) its refusal to credit his allegations and evidence concerning the nature of the detention site; and (iii) its failure to appreciate the absence of any practical obstacles that would genuinely inhibit judicial review of the legality of his continued detention.  These are the key *Boumediene* factors, and the district court failed, in each case, to consider the operative allegations of the petition (as supplemented by petitioner's evidence) and

---

[5] The court also erred in discounting petitioner's evidence of purposeful evasion on the basis that it was "publicly available when they presented their case to the Court of Appeals in *Al Maqaleh II* and thus may not lead this court to depart from the conclusion that court reached."  (JA1275).  Amanatullah was not a party to *Al Maqaleh II*.  The court below reviewed his petition in the first instance, and this is the first time that his petition has been considered on appeal.  The fact that different petitioners in a separate proceeding did not present certain evidence has no bearing on whether the court should have considered that evidence in this proceeding.

16

draw all inferences in petitioner's favor.  Rather, the court consistently weighed the evidence against petitioner and applied an unwarranted "not completely one-sided" evidentiary standard in ruling against him.[6]

### III.  The District Court Improperly Denied Petitioner's Request for Limited, Non-Classified Jurisdictional Discovery.

The district court could have resolved disputed jurisdictional facts by allowing petitioner limited discovery of non-classified information pertinent to the threshold jurisdictional issue.  It refused to do so.  But instead of drawing inferences against the government for withholding such vital information, the court drew them the other way, simply accepting the government's assertions without demanding their substantiation.  The court's rejection of petitioner's request for discovery in these circumstances is reversible error.

The most glaring example of a crucial dispute that could readily have been resolved by discovery concerned Amanatullah's status and the basis for his continued detention.  Entirely closed off from the world and his counsel, Amanatullah has only been allowed by his jailors to communicate that he has been "cleared for release."  If he has been told by U.S. authorities anything more about why he was detained in the first place, why he was rendered from Iraq to

---

[6] Petitioner Amanatullah will discuss in his brief the "status" and "practical obstacles" factors and defer to the *Al Maqaleh* petitioners to brief the "nature of the detention site" and the government's selection of Bagram to purposefully evade judicial review.

Afghanistan, and why he is now deemed cleared for release but still remains in custody, he has not been allowed to share such information with his counsel, and the government – with the district court's inexplicable affirmation – has refused to reveal it.

Instead of submitting evidence on the jurisdictional issue, the government offered the naked conclusion that Amanatullah's DRB reviews determined that he "met the criteria for internment." (JA1230, ¶ 15). Conspicuously absent from Vice Admiral Harward's declaration, however, is any information as to what specific "criteria" Amanatullah purportedly met and the particular evidentiary basis for the DRB's conclusion that he met it. Critically, this information is not only readily available to the government and is non-classified, it presumably has already been revealed to Amanatullah himself. He simply was not permitted to communicate it to his counsel or to the court below. As Vice Admiral Harward's declaration avers, under DRB procedures, the government was required to ensure "that a detainee receives timely notice of the basis for his internment, including an unclassified summary of the specific facts that support the basis for such internment." (JA1227-28). This concession precludes any conceivably legitimate argument that this information should not be made available to petitioner's counsel and the court for consideration on the government's Rule 12(b)(1) motion. Yet the court demanded nothing from the government and denied petitioner's incontestably

18

reasonable request for discovery that would require the government to provide that information.

No exhaustive review of this Court's jurisprudence on threshold issue discovery is needed to understand that the district court's refusal of discovery in the instant circumstances was an abuse of discretion. This Court has made clear that a district court resolving disputed factual issues outside of the complaint on a Rule 12(b)(1) motion must be conscious of the procedural protections necessary to ensure "a full airing of the facts." *Herbert*, 974 F.2d at 198. There can be no doubt that in this case the government has withheld crucial facts to petitioner's detriment, and the district court simply allowed it. Where, as here, the non-movant is prejudiced by the inability to discover facts relevant to subject matter jurisdiction, "a refusal to grant discovery constitutes an abuse of discretion." *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002). The court's refusal to allow petitioner limited discovery here is particularly egregious because it condoned the government's apparent strategy of selectively disclosing information only when that information was beneficial to its own position.

## IV. The District Court Erred in Its Analysis of the "Status" Factor Under *Boumediene*.

The first factor listed by the Supreme Court in its seminal *Boumediene* decision is "the citizenship and status of the detainee and the adequacy of the

19

process through which that status determination was made." 553 U.S. at 766. The district court all but ignored this factor and plainly discounted its importance. In its recitation of the facts, it noted that Amanatullah is a citizen of Pakistan – a country with which the U.S. is not, and has never been, at war – but the import of that fact was not discussed in the court's opinion. The court similarly paid little attention to Amanatullah's status, despite the fact that the Supreme Court listed it as part of the first factor to be considered. Instead, the court blindly adopted the government's contention that whether a DRB at Bagram "found [Amanatullah] eligible for release" is "irrelevant to the *Boumediene* analysis." (JA1272). This simply is not correct.

It defies any principle of logic or evidence to assert that whether the government has cleared someone for release should not be a relevant evidentiary fact in evaluating the status factor under *Boumediene*, particularly where, as here, it is one of the very few genuine data points that are available given the government's veil of secrecy.

The court below accepted that the DRB procedures for determining Amanatullah's status were inadequate, as this Court previously ruled in *Al Maqaleh II*, but it ignored the ramifications of this fact in Amanatullah's circumstances. On every level, the district court's purported application of the first *Boumediene* factor was wrong, and this Court should reverse on this ground alone.

20

### A.     Amanatullah's Citizenship

Amanatullah is indisputably a citizen of Pakistan and not Afghanistan where he is currently in custody, and this fact is important to his habeas rights. He is a citizen of a U.S. ally, a country with which the United States has never been in armed conflict. He is ***not*** an Afghan fighter supporting the Taliban against the current Afghan government. He was not captured and detained during hostilities in that country. His continued detention cannot be justified by a need to mitigate the risk that he will return to the battlefield in Afghanistan on the side of the Taliban and thus represent a continuing threat to the United States or its allies in that country. He was never on that battlefield. He did not choose to be in the war theater that is Afghanistan; he was involuntarily sent there by the U.S. government.

Neither does the government allege that he was on the battlefield in Iraq, but to the extent it might have argued that he was, the Iraq war is over and there is no battlefield to which he might return. He just wants to go home, and there is no legitimate basis for asserting an actual risk that he will do otherwise. This factor should weigh heavily in favor of his rights to a habeas review. The district court ignored it.

### B.     Amanatullah's Detainee Status

The district court simply defaulted on its obligation to consider Amanatullah's status as a detainee. It did not require the government even to say

21

how he was classified, much less to adduce any evidentiary support for such classification.  It gave no consideration whatsoever to what difference his classification might make.  It deemed his evidence that his status had changed to "eligible for release" to be irrelevant to the court's mission to determine whether it can hear his habeas petition.  In every respect, the court erred in this determination.

### 1.    Amanatullah's Capture in Iraq Likely Shows He Is Entitled to Immediate Release.

In the proceeding below, the government intentionally refused to reveal the specific grounds for Amanatullah's detention.  Instead, the government provided only the most conclusory of statements that Amanatullah "met the criteria for internment" and "is lawfully detained."  (JA 1230, ¶ 15).  That is not evidence; it is simply a conclusion.  Instead of taking seriously its obligation to examine the first *Boumediene* factor in respect of Amanatullah's status, the court simply accepted the content-free statements of the government.  Petitioner respectfully submits that his actual status matters, not just because the Supreme Court says so in *Boumediene* – although that is more than enough – but because his actual status, both currently and at the time he was taken into custody and rendered to facilities in Afghanistan, is likely, indeed, almost certain to show that he is entitled to immediate release.

There are only three possibilities as to the government's factual basis for detaining Amanatullah.  First, he could have been considered to have supported Al

Qaeda or the Taliban in the September 11, 2001 terrorist attacks in the United States or to have given refuge to such supporters after the fact. But there is no suggestion whatsoever, much less a scintilla of evidence in support, that this is the case. Second, he could have been thought to have engaged in hostilities in Afghanistan, but as a Pakistani citizen who was taken into custody in Iraq, this is far-fetched and, again, unsupported. Third, he could have been thought to have engaged in hostilities in Iraq, which may have been the British view since that country's forces seized him there.[7]

The government undoubtedly has refused to reveal its factual basis for Amanatullah's "enemy" status because it would be tantamount to a concession that his *continued* detention is wrong. The most likely factual allegations the government asserts against Amanatullah are, as noted above, that he purportedly engaged in hostilities in Iraq. But if he were captured while fighting U.S. or allied forces *in Iraq*, or supporting war efforts of the opposing forces *in that country*, and was taken into custody to prevent him from rejoining *that battle*, he has been entitled to release since at least December 15, 2011, when the United States

---

[7] To be clear, a petitioner's "status" for purposes of *Boumediene* is determined by how the government has classified him and not by what his status truly is. The former is a factor for testing whether the petitioner is entitled to have his habeas petition heard; the latter would be determined by the habeas review itself. Here, petitioner Amanatullah alleges that his true status is that of a wrongly detained innocent, as his petition seeks to prove.

23

formally declared those hostilities to have ended.  There is no battlefield in Iraq,

where U.S. and allied forces remain engaged, to which Amanatullah could return,

and the Law of Armed Conflict, which the United States concedes "informs" the

AUMF (JA1230 ¶ 15), dictates that combatants should be released and repatriated

to their home countries upon the end of the hostilities in which they were engaged.

As the Supreme Court held in *Hamdi v. Rumsfeld*, 542 U.S. 507, 520 (2004), "[i]t

is a clearly established principle of the law of war that detention may last no longer

than active hostilities."  The government acknowledged this obligation when it

proffered the Harward Declaration, stating that the detention of at least some of the

alleged "enemies" held at Bagram "prevents them from returning to the battlefield

and denies the enemy the fighters needed to conduct other attacks and to perpetuate

hostilities."  (JA1227, ¶ 7).

> **2.    The Government's Determination Clearing Amanatullah for Release Must Be Weighed as Part of His "Status" Under *Boumediene*.**

To date, the government has urged an understanding of "status" that is

unsupported by *Boumediene* and narrowly limited to the government's

determination of "detainability."  The government would have this Court ignore

DRB determinations about whether Amanatullah's continued detention is still

"necessary."  (JA847-61, 70:02-74:08).  But under *Boumediene* this Court cannot

do so.

24

When *Boumediene* was before the Supreme Court, the government used two separate processes to assess the detention of prisoners in its custody at Guantánamo: the Combatant Status Review Tribunals ("CSRT") and the Administrative Review Board ("ARB").  The CSRTs determined if a prisoner "met the criteria for internment."   (JA338).   And the ARBs determined whether a prisoner's continued internment was "necessary." (JA69).   To be sure, the *Boumediene* opinion only discusses the CSRTs – but that is simply because, as a *factual* matter, there was no evidence on the record before the Court to suggest that the *Boumediene* petitioners had yet been *subjected* to ARBs.  This Court, by contrast, has ample evidence before it that through the DRBs, the government has assessed Amanatullah's "detainability" *and* the "necessity" of his continued detention. (JA1229 ¶¶ 12-15; JA1187 ¶ 29).  Because both sets of determinations reflect the government's exclusive control over Amanatullah (who cannot challenge his detention under the laws of any other nation), and both determinations presumably supply the government's justification for his detention, both determinations *necessarily* trigger the bedrock separation of powers concerns that are so unique to habeas jurisdiction and that define *Boumediene*. Consequently, the government's reliance on this Court's decisions in *Almerfedi v. Obama*, 654 F.3d 1 (D.C. Cir. 2011), and *Awad v. Obama*, 608 F.3d 1 (D.C. Cir. 2010), is inapposite.

25

Unlike the petitioners in *Awad* and *Almerfedi*, Petitioner Amanatullah has *not* had a habeas proceeding; it is what he seeks on this appeal. The factual basis for why he was first taken into custody is not disclosed on this record. But the government does not contest that it has since cleared him for release. He is *not* seeking to force the government to make a determination that he no longer poses a threat; the government has already made that determination in concluding that he is cleared for release. He simply asked that the court take that determination into account in ruling on the government's jurisdictional challenge. In fact, petitioner's current status as "cleared for release" is the single most important factor supporting his entitlement to habeas review, and *Almerfedi* and *Awad* do not hold to the contrary.

Underlying the district court's ruling was its mistaken premise that it is only a petitioner's status at the moment when he was first detained that matters and not any subsequent redetermination of that status in further proceedings. Yet *Boumediene* itself shows that premise to be false. In assessing the status of the detainees in that case, the Supreme Court did not confine its inquiry to the status of the detainees at the time they were first taken into custody. Like its assessment of the other factors, the Supreme Court's assessment of the status of the detainees in

26

*Boumediene* was a "real time" determination based on the situation in the present.[8]

Indeed, the Court expressly examined the procedural protections of Guantánamo's CSRT process and relied on the *Boumediene* detainees' most recent CSRT findings.  In so doing, the Court noted the difference between how the "enemy alien" status of the detainees in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), was determined after "a rigorous adversarial process to test the legality of their detention," while the *Boumediene* petitioners had only been "afforded some process in CSRT proceedings to determine their status."  *Boumediene*, 553 U.S. at 766-67.[9]  Where, as here, a DRB proceeding, despite its deficiencies, has determined that petitioner Amanatullah is cleared for release, his revised status

---

[8] This is entirely consistent with federal courts' general approach to determining their subject matter jurisdiction.  As the Supreme Court observed in *Grupo Dataflux v. Atlas Global Grp., L.P.,* 541 U.S. 567, 570 (2004): "It has long been the case that 'the jurisdiction of the court depends upon *the state of things at the time of the action brought*.'" (quoting *Mollan v. Torrance,* 22 U.S. 537, 539 (1824)) (emphasis added).

[9] The fact that it is the status of the habeas petitioner at the time of judicial review that matters, and not his status when first taken into custody or at some other time between his first detention and judicial consideration of his petition, is nowhere better illustrated than in the *Padilla* matter, where the petitioner was first taken into custody by civil authority to face criminal charges, then turned over to military authority and held in a naval brig as an enemy combatant, and then returned to civil authority for trial on criminal charges.  At each stage, the courts addressed his petition through the lens of his then-current detention status.  *See Padilla v. Hanft*, 547 U.S. 1062, 1062-63 (2006) (Kennedy, J., concurring in denial of certiorari) (reciting procedural history).

27

should be a paramount consideration in determining his eligibility for habeas review.[10]

*Almerfedi* has no bearing on this issue. There, this Court reversed the district court's decision granting a Guantánamo detainee's petition for writ of habeas corpus on grounds that the evidentiary record developed in hearing the petition supported the government's determination that Almerfedi was, in fact, part of al Qaeda. The Court acknowledged that at some point Almerfedi had been approved for transfer from Guantánamo but ruled that this fact was irrelevant to whether his continued detention, based on an evidentiary finding that he is an enemy combatant, was lawful, citing *Awad*, 608 F.3d at 11. *Almerfedi*, 654 F.3d at 4 n.3. The mere fact that the government intended to transfer him did nothing to undermine the determination that Almerfedi was part of al Qaeda.

*Awad*, on which the *Almerfedi* Court based its ruling, had rejected another Guantánamo petitioner's appeal from the denial of a writ based on an evidentiary determination that the petitioner was captured after joining al Qaeda fighting forces who had barricaded themselves inside a hospital in Afghanistan. Awad argued that

---

[10] Petitioner respectfully submits that the government would not argue the contrary if the situation were reversed. For instance, if an Iraqi were captured during that recently concluded war and held as an "enemy combatant," but upon cessation of those hostilities the government discovered evidence that he had actively assisted in the September 11 attacks, the government would rightly insist that its revised classification of the petitioner as an "unprivileged enemy belligerent" not entitled to release would be the classification that matters.

the district court was obliged to make a further finding as to whether he "would pose a threat to the United States and its allies if he were released." *Awad*, 608 F.3d at 11. Citing *Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010), the Court ruled that "the United States's authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released but upon the continuation of hostilities." *Id.*

What *Almerfedi*, *Awad*, and *Al-Bihani* have in common is that they all concern the detainees who have had the benefit of full-blown habeas review that determined their detentions to be lawful. These cases have no application in the present circumstances. Petitioner Amanatullah has *not* had a habeas proceeding; it is what he seeks on this appeal. He has not demanded a determination whether he is currently considered a threat; the government has made that determination in classifying him as cleared for release.

In short, petitioner Amanatullah is before this Court in a very different posture than the detainees in *Almerfedi*, *Awad*, and *Al-Bihani*. He simply asks that he receive habeas review because he qualifies under *Boumediene* for such relief. The principal *Boumediene* factor in his favor is his status, not as an adjudicated enemy combatant, but as a detainee whom the government itself has cleared for release. Far from being "irrelevant" to the instant appeal, petitioner's clearance for release should be the single most important consideration in deciding his

29

entitlement to a habeas hearing challenging his continued confinement. In these circumstances, it ought to outweigh any other consideration.

### C.     Adequacy of Process

The district court correctly recognized that this Court has previously determined that the procedures at Bagram for determining a detainee's status are "less robust" than those at Guantánamo. (JA1272). On that basis, the court declined to consider petitioner's additional evidence showing how severely flawed the Bagram procedures truly are, presumably on the mistaken premise that once the procedures are acknowledged to be inadequate, and this *Boumediene* factor is found in petitioner's favor, it matters not how bad those procedures are. Yet it seems self-evident that this factor should count more in the overall calculus if it weighs heavily for one party than if it merely tilted the balance ever so slightly.

More important, it should be given greater weight when applied to Amanatullah's circumstances than it would to a detainee in the abstract because it dovetails so significantly with the other "status" factors. Where, as here, the government will not even disclose its factual basis for determining Amanatullah's status, the further fact of the wholly inadequate procedures it uses to make its status determinations should multiply the importance of how strongly in favor of granting habeas review these considerations should have disposed the district court. Instead, the court's analysis was that of a simple addition checklist: (1)

citizenship was ignored, (2) status was deemed irrelevant, and (3) adequacy of process was deemed on Amanatullah's side of the ledger but not so strongly that it ultimately mattered to the court in reaching its decision.

## V.    The District Court Also Erred in Its Analysis of the "Practical Obstacles" Factor Under *Boumediene*.

The district court's analysis of the "practical obstacles" factor was superficial at best.  It essentially seized on the fact that Bagram is located in "an active war zone" as the sole consideration of consequence.  (JA1274).  But while *Boumediene* recognized that "more weight" ordinarily should be given to this fact, it did not deem it dispositive.  *Boumediene*, 553 U.S. at 770.  Indeed, the Supreme Court listed three other considerations affecting how this fact weighs in the balance and made clear as well that this analysis is not static.

First, the *Boumediene* Court acknowledged that there are monetary costs involved with holding that habeas is available in the case of military detention abroad, but it minimized this consideration on grounds that compliance with any judicial process requires some "incremental expenditure of resources" but none that have kept civilian courts and the U.S. military from "function[ing] along side of each other at various points in our history."  *Id.* at 769.  The government did not argue that a hearing here presented anything beyond an "incremental expenditure."

Second, the Court observed that there are "no credible arguments that the military mission at Guantánamo would be compromised if habeas corpus courts

had jurisdiction to hear the detainees' claims." *Id.* And the government presented no argument that such compromise would occur here. As the government explained, the operation of the Bagram detention facility is the responsibility of the CJIATF 435, not of armed forces engaged on the battlefield. (JA773-76). There is no suggestion that allowing habeas review would compromise the CJIATF 435's mission nor that it would draw away support from our battlefield troops. CJIATF 435 is performing this mission right now by assisting in Afghan proceedings.

Third, the Court found in *Boumediene* that there was no indication that adjudication of a habeas petition of detainees at Guantánamo "would cause friction with the host government." 553 U.S. at 770. There is equally no indication that such friction might occur with the Afghan government. The U.S. government presented no evidence that the Afghan government would object to habeas hearings being held in U.S. courts for non-Afghan detainees. Petitioner presented probative evidence to the contrary, indicating that the Afghan government favored "access to a fair judicial process and adjudication of their case by a competent court" for non-Afghan detainees "caught outside of Afghanistan and brought to Bagram." (JA898-99, submitted in *Amanatullah* in ECF No. 23). This evidence was in the form of a letter from the Chief of Staff to the Afghan President, but the district court, at the government's urging, rejected it out of hand because the letter was deemed not to be a statement of official Afghan policy. (JA1274).

The fact at issue, however, was not what is official Afghan policy but whether conducting habeas hearings in a court in the United States over the detention of non-Afghans "would cause friction with the host government," and the Chief of Staff's letter, official or not, is certainly probative of that fact. It is, moreover, consistent with the conceded fact that Afghan civil courts, with the permission and assistance of U.S. authorities, have begun conducting full-scale trials to determine the culpability of Afghan detainees at Bagram, clearly reflecting that the Afghan government supports "access to a fair judicial process and adjudication by a competent court" for its own citizens and making it highly implausible that it would object to similar treatment by the United States of the non-Afghan detainees it holds. Moreover, the Afghan government has made clear it will not take custody or bring to trial non-Afghans, and there is no risk of conflicting sovereign processes.

The district court recited no evidentiary basis for rejecting petitioner's submission of the Chief of Staff's letter on this issue. It offered no reason for rejecting petitioner's well-pleaded allegations on this point, despite its obligation to accept such allegations as true unless countered by evidence from the government. The court did not even acknowledge that the government wholly failed to counter petitioner's allegations concerning the absence of friction with the host country over the issue, when, surely if such friction were actually known or reasonably

33

anticipated, the government would have been able to provide evidentiary support for it.  Instead, the court focused not on whether such friction would actually arise, but on the non-issue of whether the letter represented an official policy statement.

The district court compounded this error by shifting the friction inquiry to something altogether different, namely whether the letter, "even if it were official policy" would "'require a lesser diversion of military resources, change the fact that Afghanistan 'remains a theater of war,' or avert a potential conflict between the U.S. military and our courts.'"  (JA1274 quoting *Al Maqaleh III*, 2012 WL 5077483, at *8).  Of course, it would not affect these different considerations, but that is hardly the point.  It does affect the inquiry whether allowing U.S. habeas petitions would likely cause friction with the Afghan government, and that was the only point on which it was offered.  The evidence regarding friction was, in fact, "entirely one-sided" in favor of Amanatullah.  The district court's conflation of this consideration with others on the subject of "practical obstacles" was erroneous.

Finally, even the centerpiece of the district court's analysis – its observation that Bagram is located in an active theater of war – went unexamined.  Plainly, this is a matter of degree.  Bagram is not located at a forward operating base under constant threat of bombardment.  It would, of course, be folly to suggest that the U.S. military must participate in habeas proceedings in those extreme circumstances and presumably the government would not render prisoners from

34

another county for detention in such an environment. Instead, Bagram is nearer the opposite end of the spectrum, so much so that both Afghan and U.S. authorities deem it a suitable setting not just to maintain a prison but also for full-scale trials of Afghan detainees, which undoubtedly require more security and more resources than would be required of habeas hearings in U.S. courts. By its own conduct, the government provided powerful evidence that Bagram's location in a theater of war does not constitute a "practical obstacle" to adjudicating whether detainees should be released or remain incarcerated.

Bagram's location poses even less of a practical obstacle to conducting habeas hearings for non-Afghan detainees. Those hearings will ***not*** be held at Bagram; they will be held in the United States. They likely will require less involvement by U.S. military personnel than is required of them in the trials of Afghan detainees, where they are responsible for providing forensic evidence and reports of fact investigations that serve as the basis for Afghan prosecutions at Bagram. (JA773-76). Apart from possible involvement in transcribing or providing video link testimony of witnesses unable to travel to the United States, the U.S. military's role in U.S. habeas proceedings is likely to be significantly less than the role it has voluntarily undertaken in connection with the Afghan prosecutions at Bagram. The district court gave no consideration to these circumstances, however, content just to note that Bagram is in a war theater and to

35

conclude, without genuine analysis, that this alone is sufficient to resolve the "practical obstacles" factor in the government's favor.

In sum, while Afghanistan remains an active military zone (to which Amanatullah was involuntarily transferred), the Supreme Court found this factor important but did not rule it to be determinative of the "practical obstacles" factor explored in *Boumediene*, merely listing it as one of a number of considerations bearing on that factor.  In the instant case, the district court erroneously departed from *Boumediene*, treating the fact, standing alone, that Bagram is located in a war theater to be determinative of the "practical obstacles" factor, without any consideration of how that fact actually affects the handling of habeas petitions in U.S. courts.  This failure to properly evaluate the "practical obstacles" factor based on objective evidence is yet another independently sufficient ground for reversal.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment below dismissing petitioner Amanatullah's habeas petition on subject matter jurisdiction grounds.

Dated:  April 26, 2013                    Respectfully submitted,


By:_____/s/_____Eric L. Lewis_____
        Eric L. Lewis  (#39627)
        A. Katherine Toomey  (#46678)
        LEWIS BAACH PLLC
        1899 Pennsylvania Avenue, NW
        Washington, DC  20006
        Telephone:  202-833-8900
        Facsimile:  202-466-5738
        eric.lewis@lewisbaach.com
        katherine.toomey@lewisbaach.com


        _____/s/___Tina M. Foster_____
        Tina M. Foster
        Golnaz Fakhimi
        International Justice Network
        P.O. Box 610119
        New York, NY 11361
        Telephone: 718-717-8467
        tina.foster@ijnetwork.org
        golnaz.fakhimi@ijnetwork.org


        Counsel for Appellants

37

## **CERTIFICATE OF COMPLIANCE**

In accordance with Fed. R. App. P. 32(a)(7)(c), the undersigned hereby certifies, on the basis of the word count of the word-processing system used to prepare the brief, that the foregoing brief contains 8,631 words.

Respectfully submitted,


/s/     Eric L. Lewis
Eric L. Lewis

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2013, I electronically filed the foregoing Brief of Appellants, with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/    Eric L. Lewis
Eric L. Lewis

39